SEABOARD WAREHOUSE CO., INC. *v.* UNITED STATES

**No. 5255.**—Invoice dated Duesseldorf, Germany, July 3, 1935.
Certified July 5, 1935.
Entered at Texas City, Tex., July 23, 1935.
Entry No. 13.

(Decided May 13, 1941)

*Harper & Harper* (*Abraham Gottfried* of counsel) for the plaintiff.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Samuel D. Spector* and *Richard F. Weeks,* special attorneys), for the defendant.

EVANS, Judge: This is an appeal to reappraisement from the finding of value by the local appraiser on an importation of seamless steel tubing and casing imported at the port of Texas City, Tex. It appears from the official papers that the appraiser approved the *per se* unit value of the merchandise in question as being the dutiable value but that he added to make market value a "selling commission" of $5,714.54. It is conceded that there is no foreign-market value for the merchandise because the same is manufactured "according to the American specifications." It was stipulated at the hearing that the only real issue in the case is whether or not the appraiser should have added the so-called selling commission of $5,714.54. The record discloses that the merchandise is dutiable on the basis of the export value.

Plaintiff's case consists of the testimony of the secretary of the plaintiff corporation, Mr. H. Oberste-Lehn, who claims that he placed

the order for the instant merchandise to be delivered to the firm of J. Kahn & Co. of Dallas, Tex., and that the entered values represent the price he paid for the merchandise, there being some slight variation for computation of size and diameter of tubing.

It further appears from the testimony that he made an outright purchase with the idea of selling the tubing for a profit, which he did.

The following testimony was given concerning the transaction:

Judge DALLINGER. In other words, you bought this merchandise outright and sold it the same as any other business man, and made a profit?

The WITNESS. Yes, sir.

Judge DALLINGER. And you were not acting as an agent?

The WITNESS. No, sir.

The plaintiff also introduced an affidavit, exhibit 1, of the export manager of Roehren-Verband, G. m. b. H., which it appears is the exporting agent of the manufacturing concern in Germany. He stated that he was familiar with the transaction and that the order was accepted by his concern on or about May 31, 1931, The sale was made to the Steel Union, Inc., of Los Angeles, the plaintiff herein. The price at which the merchandise was sold was $191,467.94, c. i. f. Texas City, Tex., exclusive of duty which was the equivalent to them of a price of $92,975.61 packed ready for delivery at the mill, including the cost of inspection. He further states:

That the aforesaid merchandise was sold outright to Steel Union Inc., and no commission of any kind was paid to them or to any one else. Röhren-Verband G. m. b. H. received the full purchase price set forth above, without any deductions of any nature.

The defendant introduced a number of special agents' reports, one of which was made by an agent who had visited the office of the exporting concern. He had before him the invoice involved herein, to wit, invoice 3195. Among other things the special agent's report mentions a contract claimed to have been made with the concern known at Steel Union, Inc., of New York and the so-called Steel Trust in Germany. The mention of this contract, together with the data relating to transactions had with the Steel Union, Inc., of New York is possibly responsible for the addition of the so-called selling commission in question. Without going into the details of this contract and the relationship of that corporation to the manufacturer and exporting agents, suffice it to say that the contract in no way related to the plaintiff corporation, which was a California concern organized under the laws of California. And there is nothing in the record to show that this transaction in any way passed under the supervision nor was it made subservient to any agreement made with the exporters and the New York corporation. In fact, it was out of business and apparently the contract had ended when this concern made the present importation and a corporation known as

the Steel Sheet Piling, Inc., had succeeded to the representation of the exporters in New York City and perhaps elsewhere. The relation between the Steel Sheet Piling, Inc., and the manufacturers and exporters is not shown by the special agents' reports.

Furthermore, the original contract recites that the States of Washington, Oregon, and California were exempt from the provisions of that contract.

The attorney for the defendant argues that some adverse conclusion should be reached because of the fact that the commercial invoice attached to the consular invoice indicates that the merchandise was purchased or agreed to be purchased by Kahn & Co. from the exporters; that paper does so state. It is also observed that the consumption entry was made by the Seaboard Warehouse Co., Inc., A/C Steel Union, Inc., Los Angeles, Calif., and a declaration of the nominal consignee or agent shows that Steel Union, Inc., of Los Angeles, Calif., was the actual owner or consignee.

Furthermore, defendant's exhibit 3, a special agent's report of which mention was made, recites on page 5 thereof that the merchandise in question was sold by the foreign dealers to the parties named in the consular invoice, to wit, Kahn & Co. of Dallas, on an order from the Steel Union Co., Inc., of Los Angeles, the statement in the report being:

I inspected the shipper's records and ascertained that the original order received from Steel Union Co., Inc., Los Angeles, by Roehrenverband, Duesseldorf, was dated April 27, 1935.

The actual prices quoted by the special agent coincide, with a variation of a few cents on each item. So that there appears to be no sinister conclusion to be drawn. The plaintiff placed the order for the same for Kahn & Co. who acknowledged that they purchased the same and they have furnished information (exhibit 1) as to the purchase price which corresponds, after proper deductions, to the entered values.

In rebuttal the plaintiff offered in evidence exhibit 7, an affidavit of E. J. Kahn of J. Kahn & Co., of Dallas, Tex. The record indicates that the trial judge at the time thought the qualifications of the notary public should have been established. It is observed that the defendant made no objection to the admission of exhibit 2 because the capacity of the notary to take the acknowledgment had not been proven. The laws of the State of California require the courts in that state to take judicial knowledge of the seals of notaries public. Section 372 of the Civil Code of the State of California, provides:

Sec. 372. Judicial Notice of Foreign Law.—In any action or proceeding, the court shall take judicial notice without proof in court of * * * the seals of state and state officials and notaries public, * * *.

The court is of the opinion that exhibit 7 is admissible and so rules, and that no error was committed in receiving the special agents' reports in evidence. They seem to be certified in accordance with the provisions of the statute by an officer in whose custody the original reports are filed.

Furthermore, the secretary of the importing corporation testified at length denying any connection between his concern and either of the New York organizations referred to in the special agent's report and positively swore that the Steel Union, Inc., of California at no time during this transaction received a commission from the exporting concern or from anyone else, and that the transaction was purely a purchase transaction. He did state that he had at times had commission transactions in which event he usually received a 4 per centum commission. Because of that fact some contention is made that the appraiser added this amount believing that the seller had received a commission. Certainly it couldn't have been a 4 per centum commission because the court can make no computation on the basis of a 4 per centum commission that would equal the advance made. The explanation of how this figure came to be used is given in exhibit 7. In my judgment it is a reasonable explanation and I see nothing in the record that warrants the court in discrediting it in any way. The statement in that respect is as follows:

That due to an error on the part of a bookkeeper, and in affiant's absence, J. Kahn & Company wrote to Steel Union, Inc. asking for a refund of $5,714. 54; that this error was caused as follows: That as part of the transaction, J. Kahn & Company was to advance the sum of $29,000.00 to cover the duty paid on the merchandise; that the duty only came to $23,285.46; that the bookkeeper assumed that the difference between the sum of $29,000.00 and $23,285.46, amounting to the aforesaid sum of $5,714.54, was an excess which was subject to refund by Steel Union, Inc.; that J. Kahn & Company was not entitled to the refund of the aforesaid amount for the reason that at the time the refund was requested, J. Kahn & Company still owed to Steel Union, Inc. on account of the purchase price of the merchandise the sum of $7,807.32; that instead of being entitled to the refund of $5714.54, J. Kahn & Company still owed, after applying the aforesaid sum of $5714.54 to the purchase price, the sum of $2092.78.

That the foregoing is the only relation that the sum of $5714.54 bore to the instant transaction; that it did not represent a commission of any kind; that, as hereinbefore stated, it merely represented the difference between the monies advanced to cover duties and the actual duties paid.

I therefore find that there is no foreign-market value for the imported merchandise; that there is an export value and that the entered value represents the export value, i. e., the purchase price per unit of 100 feet as invoiced less the following items, cartage to harbour and delivery f. o. b., sea freight, insurance, and consular fees, as invoiced. I so find.

Judgment will be rendered accordingly. It is so ordered.